## Alley Means *v.* The State.

1. Mesne Process on Change of Venue.— The Revised Code of Procedure, art. 591, provides that all witnesses already under recognizance or served with process shall be thereby bound, on a change of venue, to appear before the court to which the cause is transferred. New process is not necessary.

2. Continuance — Evidence.— In a trial for murder the defense asked a continuance in order to obtain proof that other persons besides the defendant had motives and opportunities to have killed the deceased. The inculpatory evidence not being purely circumstantial, it is *held* that the proposed proof was irrelevant and immaterial, and that the refusal of the continuance was not error.

3. Murder — Declarations as Res Gestæ.— The State was allowed, over objection, to prove that the deceased, while sitting in a church and after gazing out of a window, told a companion that the accused was outside and fixing to kill him (the deceased), and immediately stepped to the door, where he was fired upon and instantly killed. *Held,* that the declaration was *res gestœ,* and was properly admitted in evidence.

4. Charge of the Court.— An instruction to the effect that the jury should reconcile conflicts in the evidence, if practicable to do so, and, if not, should give credence to the witnesses they deem most entitled to belief, is superfluous, but not ostensibly on the weight of evidence or otherwise violative of the Code of Procedure.

5. Alibi — Reasonable Doubt.— In a murder case the defense was an *alibi,* and the defendant's proof was to the effect that, at the time of the homicide, he was with his brother at a ranche several hundred yards distant. Besides charging the reasonable doubt on the entire case and on the general question of the defendant's presence at the place and time of the homicide, the charge applied it specifically to the defendant's proof. *Held,* that this did not restrict the scope of the defense of *alibi.*

Appeal from the District Court of Nueces.    Tried below before the Hon. John C. Russell.

At the September term, 1876, the indictment in this case was returned by the grand jury of San Patricio county, and charged the appellant with the murder of Edward R. Garner, on August 26, 1876, by shooting him with a pistol. At a subsequent term of the District Court

of San Patricio county, the venue was changed to the county of Nueces in consequence of the impracticability of obtaining a qualified jury in the former county. At the May term, 1880, of the Nueces District Court, a trial was had, resulting in a verdict convicting the appellant of murder in the first degree, and assessing his punishment at a life-term in the penitentiary.

The homicide was an assassination perpetrated under circumstances denoting more than ordinary depravity. The first witness for the State was Marion Garner, a brother of the deceased. He testified that he and the deceased, accompanied by another brother and a cousin, were in attendance on church services in a school-house at Meansville, a settlement in San Patricio county, after nightfall of August 26, 1876. The house, as appears by a diagram, was an oblong parallelogram, fronting to the east, with a door in that end, and four equidistant windows in the south side. The deceased occupied a seat opposite the third window from the door, and his brother, the witness, one immediately behind him. About eight o'clock, and after services had commenced, the witness noticed the deceased looking intently and anxiously out of the window. Witness could not see out of the window, being in rear of it, and did not know at what the deceased was looking until the latter turned and leaned over the back of the bench on which he was sitting, and in a low tone said to the witness, "Alley Means is outside there, fixing to shoot me; I am afraid he is going to shoot me right here in the church." Witness then tried to look out of the window, but failed to see anyone outside. After making the remark quoted, the deceased immediately rose and walked to the door, and before he could cross the threshold a shot was fired by some one on the outside. The deceased started back, and immediately another shot was fired. Witness saw the flash of the weapon; it was fired from the south side of the door, and was aimed

directly into the house. The first shot struck the deceased in the right side, and ranged diagonally towards his heart. The second shot missed the deceased, and, had it not been deflected upwards by striking a bench, it would have gone among the women and children. When the first shot was fired the witness started for the door, but could not reach it on account of the crowd rushing towards it. The deceased ran back from the door to the place he had occupied, fell across the bench and died immediately and without uttering a word. His wife and children were present. Witness did not go out of the house immediately, but remained with the corpse. Quite a number of people were in attendance at the services, and there was much excitement after the shooting. Witness did not see the defendant there that night. A grudge had been cherished by the defendant's family against the Garners, and particularly by the defendant against the deceased. It sprang especially out of the fact that the defendant's father had been killed by a posse led by the sheriff of Bee county and the deceased whilst he was sheriff of San Patricio county, in an attempt made by them to arrest the defendant and his brother under legal process from Bee county. The defendant's father made armed resistance to the arrest, and in the fight which ensued was killed by the posse. The defendant, after he was arrested on that occasion, threatened the deceased, telling him he would have to "suffer for this," and that the affair could not end there. Witness could not say of his own knowledge who fired the shot that killed Edward Garner.

On his cross-examination the witness stated that the defendant and the deceased had met on two or three occasions since the killing of the former's father, and that no difficulty occurred between them on those occasions, but that other persons were present when they had so met. Defendant's counsel asked the witness whether or

not the deceased had had a difficulty with one Strickland, in attempting to arrest the latter by chasing and shooting at him? Also, whether or not the deceased had had a difficulty with one Moore, in which Moore was killed by the deceased, and whether Moore had relatives and friends in that section of the country who would probably have sought to avenge his death. Counsel for the State objected to these inquiries as irrelevant and incompetent, and the objection was sustained by the court.

Marcus Peaks, for the State, testified that he and his sister attended the religious services in the school-house at Meansville, the evening the deceased was killed. On their way there, and when they were near the place, the defendant and one Tom Baker rode past them. Baker alighted from his horse and entered the school-house, but the defendant galloped rapidly away towards the house of his brother, N. B. Means. Very soon afterwards, and while the witness was standing at the southeast corner of the school-house, the defendant rode up and hitched or left his horse at the nearest tree to the building, and then, passing the witness, looked in at the first window from the door, and passed on and looked in at another window. Witness went into the house, took a seat, and saw the deceased get up and go to the door, and immediately heard two shots, by one of which the deceased was killed. When witness got an opportunity of looking out at one of the windows, the defendant's horse was gone from the tree where it had been left. The defendant, so far as witness could see, was the only person outside the house when witness entered it. On his cross-examination the witness stated that he saw no weapons on the defendant or Baker.

O. H. Hearne, for the State, testified that he was in the school-house when the deceased was killed. Before that occurrence, witness came out of the house and found the defendant on the outside, and shook hands with him.

Very soon witness went back into the house, and took a seat near to but in rear of the deceased. Observing that the deceased was "fidgety" and was looking intently out of the window, the witness also looked out of a window, and saw the defendant standing about fifteen feet off and looking in the window near which the deceased was sitting. Deceased got up and went to the door, and when he reached it two shots were fired and he turned back. Witness jumped up and ran out of the house, and saw a man run to a horse standing at the tree nearest the house. The man mounted the horse and galloped off, and as he passed into the moonshine, the witness saw and recognized him to be the defendant. At the time the deceased got up and started to the door the defendant's face disappeared from the window. Witness observed no action of the defendant indicating any hostile purpose towards any one.

Two other witnesses testified for the State in partial corroboration of those whose testimony has been already given.

The defense introduced T. B. Means, a brother of the accused. He stated that he lived four or five hundred yards from the school-house where the deceased was killed. About dusk in the evening during which that event occurred, and previous to it, the defendant came to witness' house, and, after turning his horse loose in a lot, went with witness and one Cherry to a Mexican dance or fandango which was going on at some houses about two hundred yards distant. A few moments after they reached there, two shots were fired in the direction of the school-house, and thereupon witness, defendant and Cherry returned to the house of witness, who, hearing the shots, was apprehensive that some trouble had occurred between some of his relatives and the Garners, as there was a feud between the families on account of the killing of witness' father. When the witness got home, ac-

companied by the defendant and Cherry, the wife of N. B. Means arrived there from church and informed them that one of the Garners had been shot and killed during the services. She said it was Lon Garner who was killed, and witness did not learn that it was Edward Garner until the next day. The defendant remained at the house of witness all that night and until some time during the ensuing day, when he was arrested by an officer for the killing. Cherry had since removed from that section.

The defense proposed to prove by J. G. Brown the facts relative to the difficulty between the deceased and Strickland, as previously inquired after in the cross-examination of the first witness for the State, and also proposed to prove by Brown the character and manner of Strickland. This proof, however, was again excluded by the court, and the defense, as before, reserved exceptions.

*Stayton, Lackey & Kleburg,* for the appellant.

*Thomas Ball,* Assistant Attorney General, for the State.

WHITE, P. J. Appellant was indicted for the murder of Edward R. Garner, in San Patricio county, on the 26th day of August, 1876. Two unsuccessful attempts having been made to obtain a jury for the trial of the case in San Patricio county, on application of the district attorney, made in accordance with the provisions of article 579, Code Crim. Proc., the venue was changed to the county of Nueces. By a new provision in our Code of Criminal Procedure, it is declared that "when the venue in a criminal action has been changed, it shall not be necessary to have the witnesses therein again subpœnaed, attached or recognized, but all the witnesses who have been subpœnaed, attached or recognized to appear and testify in the cause, shall be held bound to appear before the court to which the cause has been transferred, in the same manner as if there had been no such transfer." Code Crim. Proc. art. 591.

When the case was called for trial in Nueces county, appellant moved for a continuance on account of the absence of several witnesses who had been duly subpœnaed in San Patricio county, and who had not been so in default that other process might have been invoked prior to or since the change of venue. This motion was overruled by the court. So far as diligence was concerned the application was, perhaps, sufficient under the statute. Doubtless the materiality and admissibility of such testimony as that proposed to be derived from the absent witnesses was the controlling question which determined the action of the court in refusing to grant it. At all events, such considerations must govern us in passing upon the correctness of the ruling. In substance, the facts expected to be established by the absent witness were: That deceased had had serious difficulties with other persons in San Patricio county, and that these other persons were parties likely to take the life of the deceased, should an opportunity for so doing offer. Also that deceased had had a difficulty with one Moore, in which he had killed Moore; that the friends of Moore were much enraged against him, and, living in the adjoining county of Goliad, would, in all probability, avenge the death of their friend and relative; and that the probabilities were that they, or some one of them, and not defendant, were the parties or party who had killed the deceased.

The bill of exceptions shows that on the trial the defendant endeavored to prove the same facts, or facts of a similar nature and character, but all such testimony was, on objection by the state, excluded by the court. If the action of the court was wrong in any one particular pointed out by the exceptions, it was wrong in all; hence all the questions on the subject can be treated as one. The question has been so repeatedly settled and the reasons given by previous decisions of this court, that it is scarcely necessary to do more than refer to some of the cases. See *Boothe* v. *The State*, 4 Texas Ct. App. 217; *Cooper* v.

*The State*, 7 Texas Ct. App. 200; *Holt* v. *The State*, 9 Texas Ct. App. 571, and the authorities cited in those cases.

The rule is that such evidence affords no reasonable presumption or inference as to the guilt or innocence of the defendant, and it is generally treated as hearsay or *res inter alios acta.* Of course the rule has its exceptions, but they can exist only in cases where the evidence is wholly and strictly circumstantial, and where the mind, having nothing positive or definite to rest upon, seeks light and knowledge from every source, however dim, calculated to throw light upon the transaction.

Here we have a different case — a case by no means dependent upon circumstantial evidence alone. We have the defendant with a motive to commit the deed, — the fact that deceased had participated in the killing of his father, and his threatening to kill the deceased to avenge his father's death. And in addition to these motives and threats, the defendant is shown by the positive testimony of many witnesses to have been bodily present at the time and place where the homicide took place; while there is not the slightest evidence that any of his other enemies were there. More than that, we have the declaration of deceased to his brother just before the killing: "Alley Means is outside there, fixing to shoot me; I am afraid he is going to shoot me right here in the church." Immediately the deceased goes to the door, where the fatal shots are fired. No one sees the party who does the shooting, it is true, but defendant and his horse, which had been tied or was standing a few feet off, both disappear and are seen no more about the premises after the shooting. Under such circumstances, would not the mind of any sensible, rational being naturally conclude that defendant, and he alone of all the enemies of the deceased, was the party who did commit the deed, if from no other reason from the sole one that he was the only enemy who had

the then present opportunity to commit, and was the only one in immediate juxtaposition to, the crime? We think so. The case is not one purely of circumstantial evidence, and the court did not err in refusing to permit the testimony offered of the hostility of other parties.

So far as the declarations of the deceased to his brother, to the effect that "Alley Means is outside there, fixing to shoot me; I am afraid he is going to shoot me right here in church," are concerned, and which were objected to by defendant at the time, they were clearly *res gestæ*, and admissible as original evidence. *Cox et als.* v. *The State*, 8 Texas Ct. App. 256.

We propose to notice objections to only two of the paragraphs of the charge of the court to the jury. In the seventh paragraph the jury were told, "you are the exclusive judges of the facts of this case, and of the credibility of the witnesses who have testified before you. If there are conflicts in the evidence, it will be your duty to reconcile them if you can. If you cannot, it will then be your duty to give credit to the statements of the witnesses that you may believe most entitled to belief." A similar charge was passed upon by us in the case of James Williams from Nueces county, decided at the present term (*ante*, p. 8), and it was there held that, whilst a court might well pretermit such efforts to aid a jury, since there was no occasion for such aid, as to the manner in which they should pass upon the evidence, still the charge was not obnoxious to the statutory inhibitions, and could not in any perceivable manner have operated materially to the prejudice of the rights of the defendant.

The defense was an *alibi*. On this defense the jury were instructed, "If from the evidence the jury entertain a reasonable doubt of the presence of the defendant at the place Edward R. Garner was killed, at the time of the killing (if he was killed), and if they entertain a reasonable doubt that at that time he may not have been

elsewhere, and at a distance of seven or eight hundred yards distant, at a ranche with his brother, the defendant is entitled to the benefit of that doubt, and the jury should acquit him."

We do not think that this paragraph is misleading, as is contended by appellant's counsel, or that it restricts the defense of the *alibi* to a particular place at the time of the homicide. Defendant's theory and his evidence were to the effect that, at the time of the homicide, he was in fact with his brother, attending a fandango some several hundred yards off at a ranche. We cannot see how he can complain that in addition to the charge of the reasonable doubt generally, as to his presence at the time and place of the homicide, the court should also, as was done, charge it with regard to his presence also at the identical place he claimed to have been when the deed was committed. The charge was a fair and full presentation of the law applicable to the facts.

A mature consideration of the facts has left no doubt upon our minds of defendant's guilt as ascertained and declared by the jury. His crime cannot be characterized as anything less than a cold-blooded, deliberate assassination, committed in the very sanctuary of the Most High, and in the midst of the congregation and services of his people.

The judgment is in all things affirmed.

*Affirmed.*